**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| In re:<br><br>SCOTT HERRITT,<br><br>           Debtor | Chapter 13<br>Case No. 23-12160-CJP |

**MEMORANDUM OF DECISION AND ORDER ON THE APPLICABILITY OF THE STATUTORY CAP ON DAMAGES UNDER 11 U.S.C. § 502(b)(6), THE FORCE MAJEURE PROVISION, AND THE DOCTRINE OF FRUSTRATION OF PURPOSE WITH RESPECT TO LANDLORD CLAIM**

Before the Court is an objection to confirmation [ECF No. 26] (the "Confirmation Objection") filed by creditors Brom + Fled I LLC and Brahmin Realty Associates LLC (collectively, the "Landlord") to the chapter 13 plan [ECF No. 22] (the "Plan") of the debtor Scott Herritt (the "Debtor" or "Herritt"), the Debtor's response to the Confirmation Objection [ECF No. 32], as well as the Debtor's objection to the Landlord's claim [ECF No. 42], as amended [ECF No. 45] (the "Claim Objection", together with the Confirmation Objection, the "Objections"), and the Landlord's response to the Claim Objection [ECF No. 57] (the "Landlord's Response"). The Court held nonevidentiary hearings on the Objections, and the parties filed further briefing on a variety of issues raised at the hearings, in the Objections, and in other filings.[1] At this stage, the threshold questions before the Court are (i) whether the

---

[1] *Scott Herritt's Brief in Support of Applicability of 11 U.S.C. Sec. 502(B)(6)* [ECF No. 63] ("Debtor's Brief"); *Brief of Brom & Fled I, LLC and Brahmin Realty Associates LLC in Support of Their (I) Objection to Confirmation of Debtor's Chapter 13 Plan and (II) Response to Debtor's Amended Objection to Their Claim* [ECF No. 65] ("Landlord's Brief"); *Scott Herritt's Reply Brief* [ECF No. 66]; *Sur-Reply Brief of Brom + Fled I, LLC and Brahmin Realty Associates LLC* [ECF No. 68]; *Brief of Scott Herritt in Response to Sur-Reply Brief of Brom + Fled I, LLC and Brahmin Realty Associates LLC* [ECF No. 75]; *Supplemental Brief Regarding Debtor's Obligations Under the Lease During the Covid-19 Pandemic and the Effect of the Force Majeure Provision on the Same Obligations* [ECF No. 79]; *Debtor's Reply Brief in Response to Supplemental Brief of Brom + Fled I, LLC and Brahmin Associates LLC* [ECF No. 84].

Landlord's claim (Proof of Claim No. 1, the "Claim") is subject to the statutory cap imposed by 11 U.S.C. § 502(b)(6)[2] and (ii) whether, under the facts of this case, the Court should reduce the Landlord's Claim for unpaid, pre-petition rent based on a force majeure clause in the lease or application of the frustration of purpose doctrine because of the impact of the Covid-19 pandemic. Upon consideration of the Objections, the briefing and other filings by both parties, arguments made at the hearings, the record of this case, and for the reasons set forth in this Order, I am determining certain legal issues and identifying issues to be resolved after an evidentiary hearing. Because this decision does not resolve the entirety of the Claim Objection, the Court stays its decision on the Confirmation Objection pending further order.

I. **Legal Standard**

The filing of a proof of claim and the allowance of such claim are governed by 11 U.S.C. §§ 501 and 502. "A proof of claim executed and filed in accordance with [the Federal Rules of Bankruptcy Procedure] shall constitute prima facie evidence of the validity and amount of the claim." Fed. R. Bankr. P. 3001(f). A debtor may object to a proof of claim pursuant to § 502(a), and the court "shall allow" a claim unless one of the nine exceptions enumerated in § 502(b) applies. *Am. Express Bank, FSB v. Askenaizer (In re Plourde)*, 418 B.R. 495, 502–03 (B.A.P. 1st Cir. 2009). "In order to rebut the prima facie evidence a proper proof of claim provides, the objecting party must produce 'substantial evidence' in opposition to it." *Id.* at 504 (citing *In re Long*, 353 B.R. 1, 13 (Bankr. D. Mass. 2006)). If the evidence proffered by the debtor is substantial, the burden shifts to the claimant to prove its claim by a preponderance of the

---

[2] Unless otherwise noted, all section references herein are to Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq., as amended (the "Bankruptcy Code" or "Code").

evidence. *Tracey v. United States (In re Tracey)*, 394 B.R. 635, 639 (B.A.P. 1st Cir. 2008) (citing *In re Organogenesis, Inc.*, 316 B.R. 574, 583 (Bankr. D. Mass. 2004)).

## II. **Background**

The Debtor and co-lessee Mabrothers, LLC[3] (together, the "Lessees") leased certain restaurant space at which Mabrothers, LLC operated "Café Marliave" at 10-14 Bosworth Street in Boston, Massachusetts (the "Premises") pursuant to a commercial lease (as later extended, amended, or otherwise modified and assigned to the Landlord, the "Lease") originally dated December 5, 2007. The Lessees were joint and severally liable to perform the tenants' obligations under the Lease.[4] On March 15, 2020, Café Marliave closed when its revenue plummeted because of the Covid-19 pandemic. The record indicates that no material default had occurred under the Lease prior to that date, but the Lessees ceased paying rent after that date.

On April 13, 2020, the Landlord sent a notice of default for failure to pay rent. The Debtor asserts that the Lessees responded that they were unable to pay rent because of the pandemic and the "force majeure" provision in the Lease excused them from doing so. The Debtor asserts that, by September of 2020, the Lessees had determined that the restaurant business could not re-open and attempted to "formally close the business entity and to formally terminate the Lease." Debtor's Br., at 3. The Lessees made initial offers to sell the liquor license and divide the proceeds with the Landlord. The Landlord denied that the force majeure clause provided any relief to the Lessees on their rent obligations and filed a complaint in the Suffolk Superior Court to recover damages on October 6, 2020. ECF No. 63-4, 63-6, at 137.

---

[3] In his Schedule A/B, the Debtor states that he possesses a 100% ownership interest in Mabrothers, LLC. ECF No. 20.

[4] *See* Section 38 of the Lease. ECF Nos. 63-2; 65-2.

3

According to the Debtor, on April 13, 2021, the Lessees offered to settle the suit and claims under the Lease by selling the restaurant's liquor license and paying 100% of the proceeds to the Landlord, and that offer was not accepted. In July of 2021, the Lessees entered into an agreement to sell the liquor license for $425,000, which sale was consummated in January of 2022. Debtor's Br. at 5. On January 7, 2022, the Landlord issued a notice stating its intention to terminate the Lease effective January 17, 2022. ECF No. 63-7. On January 24, 2022, the Landlord demanded payment of $706,257.94 from Lessees for amounts alleged to be due under the Lease. ECF No. 63-8. The Lease term, as extended, would have ended in January of 2023.[5]

On February 27, 2022, Mabrothers, LLC filed a petition under chapter 7 of the Bankruptcy Code. Case No. 22-10229. The chapter 7 trustee appointed in that case commenced an adversary proceeding asserting that the force majeure clause in the Lease excused performance during the Covid-19 pandemic and, therefore, it was wrongful of the Landlord to send a notice of default, refuse to negotiate with Mabrothers, LLC, and charge excessive late fees. Adversary Proceeding No. 23-1025. In addition, the trustee claimed that the Landlord's asserted claim included charges that were not customarily billed to Mabrothers, LLC under the Lease. On December 15, 2023, the court approved a settlement in that case whereby the Landlord was deemed to have an allowed general unsecured claim of $350,000 to resolve the Landlord's claim against Mabrothers, LLC. Case No. 22-10229, ECF No. 61, as modified at

---

[5] The record contains some inconsistencies as to the date when the Lease term would have ended by its terms. The Landlord states that the term, as extended, ended in January 2023, Landlord's Br., at ¶¶ 23, 33, 38, but references another date in at least one filing. *See* ECF No. 79, at 11. It appears that January of 2023 is the date intended by the Landlord, as the record includes correspondence from the Debtor extending the Lease five years commencing February 1, 2018, and does not contain any further extensions. ECF No. 63-6, at 91. Further, the Landlord's proof of claim includes a claim for unpaid rent through January 1, 2023.

4

ECF No. 65. Subsequently, the Landlord received a distribution in that case in the amount of $212,890.37, and the Mabrothers, LLC bankruptcy case was closed on July 5, 2024.

On December 26, 2023, the Debtor filed this petition under chapter 13 of the Bankruptcy Code. The Landlord filed its Claim asserting an unsecured claim of $970,923.52.[6] The attachment to the Claim includes an itemized list of unpaid rent, common area maintenance charges ("CAM charges"), real estate taxes, and late fees from March 1, 2020 to January 1, 2023.

The Debtor objects to the Claim and requests that it be disallowed in its entirety. Specifically, the Debtor objects to: (i) $60,848.06 in CAM charges as arbitrarily assessed beginning in December 2020, (ii) $72,063.70 in late fees assessed from September 2020 to January 2022,[7] and (iii) $428.23 in "real estate recovery" and $50,232.65 in real estate taxes as not adequately supported by the proof of claim. The Debtor also asserts the Claim should be reduced by the § 502(b)(6) cap and that the obligation to make certain rent payments be excused because of the force majeure provision of the Lease or application of the frustration of purpose doctrine. The parties agree that the amount asserted in the Claim will be reduced by $212,890.37, the Landlord's recovery in the Mabrothers, LLC bankruptcy case. Landlord's Resp., at ¶ 56. The Landlord objects to confirmation of the Debtor's plan as it does not provide treatment of the Claim in the full amount as would be required by the Bankruptcy Code. I must rule on the Claim Objection before I can consider the Confirmation Objection.

### III. The § 502(b)(6) Cap on Lease Termination Damages

The Bankruptcy Code provides:

---

[6] The Landlord filed its claim based on "indebtedness due and owing under Guaranty of Lease," but clarified in subsequent filings that the Claim's statement that the Debtor is a guarantor under the Lease was not correct. Landlord's Resp., at ¶ 39.

[7] The Debtor describes this as "during the period in which the pandemic governmental restrictions were in place and/or while the Debtor and Mabrothers were still reeling from the impact of the pandemic." Claim Obj., at ¶ 42. The Court presumes the Debtor objects to late fees on the basis of the force majeure clause, discussed *infra*.

5

> (b) . . . if such objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount, except to the extent that—
>
> . . .
>
> > (6) if such claim is the claim of a lessor for damages resulting from the termination of a lease of real property, such claim exceeds—
> >
> > > (A) the rent reserved by such lease, without acceleration, for the greater of one year, or 15 percent, not to exceed three years, of the remaining term of such lease, following the earlier of—
> > >
> > > > (i) the date of the filing of the petition; and
> > > >
> > > > (ii) the date on which such lessor repossessed, or the lessee surrendered, the leased property; plus
> > >
> > > (B) any unpaid rent due under such lease, without acceleration, on the earlier of such dates; . . . .

11 U.S.C. § 502(b)(6). Under § 502(b)(6), a landlord may assert a claim for rent that is due and owing under a lease, without acceleration, as of the earlier of the petition date or surrender or repossession of the leased premises. That section also allows a claim for damages arising from termination of the lease but caps that portion of a landlord's claim. If applicable, § 502(b)(6) would limit damages "resulting from the termination" of the Lease to the greater of one year of rent reserved or fifteen percent of rent reserved for three years after "surrender" of the Premises.

The threshold issue presented is whether state or federal law governs a determination of "termination" and "surrender" under § 502(b)(6). After deciding the applicable law, I must next determine when the Lease was terminated.

The Landlord argues that Massachusetts law should govern when the Lease terminated. The Landlord asserts that the Lease was not "terminated" before the end of its term so no post-termination rent would be "reserved" that would be part of the Claim that could be subject to the

6

§ 502(b)(6) cap.[8]  The Landlord asserts that its Claim is based solely on rent due and owing under the Lease at the time that the Lease was terminated by expiration of its term so as to invoke only § 502(b)(6)(B) and not the limitations of § 502(b)(6)(A).

The Debtor contends that "termination" as contemplated by § 502(b)(6) has a meaning that is not constrained by state law and that the Lease "was terminated and the Premises was surrendered by the Lessees to the Landlord no later than" in September 2020.  Debtor's Br., at 8. The Debtor asserts that:

> "[t]he damages cap set forth in § 502(b)(6) is intended to ensure that a landlord does not receive a windfall in damages especially when the landlord has access to the premises and an opportunity to re-let the space, which is exactly what we have in the present case before the Court." *Flanigan v. Samalex Trust (In re Flanigan)*, 374 B.R. 568, 577 (Bankr. W.D. Pa. 2007); *see also In re Lindsey*, 1997 U.S. App. LEXIS 30502, 1997 WL 705435 at *3-4 (4th Cir. Nov. 7, 1997); *In re Thompson*, 116 B.R. 610, 613 (Bankr. S.D. Ohio 1990).  In fact, courts recognize that, in practice, § 502(b)(6) acts as a 'great equalizer' against the claims of lessors, who can mitigate damages and re-let the property. [Flanigan, 374 B.R. at 578.]

Debtor's Br., at 7.  Based on the legislative history, it is apparent that Congress intended to limit the damage claims of landlords in the context of a lessee's bankruptcy so as not to overwhelm other unsecured creditor claims but still provide some uniform estimation of reasonable damages that might be claimed after termination of a lease and surrender of possession by a tenant.  *See* S.

---

[8] The Landlord also appears to assert that the § 502(b)(6) cap only applies to future rent claims arising from the rejection of a lease in bankruptcy.  Landlord's Br., at ¶¶ 17–24.  I do not agree.  Termination of a lease can occur prepetition.  Section 502(b)(6) references "termination" not "rejection," and the policy concerns addressed in the § 502(b)(6) cap are equally applicable.  *See Lariat Cos., Inc. v. Wigley (In re Wigley)*, 533 B.R. 267, 270–72 (B.A.P. 8th Cir. 2015) (concluding that future rent following a prepetition termination was subject to the § 502(b)(6) cap); *Kupfer v. Salma (In re Kupfer)*, 852 F.3d 853, 858 (9th Cir. 2016) (applying the § 502(b)(6) cap to the portion of fees attributable to litigating the lessor's claims for future rent); *see also Flanigan v. Samalex Tr. (In re Flanigan)*, 374 B.R. 568, 577 n.14 (Bankr. W.D. Pa. 2007) ("Additional confusion regarding 'termination' in § 502(b)(6) arises because the word 'termination' was not found in the predecessor to § 502(b)(6) — § 63a(9). Section 63a(9) used the word 'rejection' instead. Further, another Code Section, § 365(g), provides that 'rejection of an . . . unexpired lease . . . constitutes a breach of such . . . lease' as opposed to stating that it constitutes a 'termination' of the lease. *See* 11 U.S.C. § 365(g) (2005).").

7

Rep. 95-989, at 63 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 5787, 5849 (referencing *Oldden v. Tonto Realty Corp.*, 143 F.2d 916 (2d Cir. 1944)); 4 *Collier on Bankruptcy* ¶ 502.03[7][a] (16th ed. rev. 2024); *In re Kupfer*, 852 F.3d at 855–56 (summarizing history of the statutory cap).

In support of its position that "termination" as used in § 502(b)(6) is not limited to termination as defined by state law, the Debtor cites this legislative history and the reasoning of the bankruptcy court in *In re Flanigan*:

> Literally defining "termination" under § 502(b)(6) to mean "termination" as defined by state law may produce absurd results in the bankruptcy context. By way of example, in the bankruptcy context where the debtor is the lessee, a lease can always be rejected without effectuating state law termination. *In re Bacon*, 212 B.R. at 69; *Westgate Village Apartments v. Sims*, 213 B.R. 641, 643 (Bankr. W.D. Pa. 1997). In bankruptcy, rejection of a lease merely renders the lease not part of the bankruptcy estate and gives rise to breach of contract claim by the lessor against the bankruptcy estate. It is this sort of bankruptcy claim (i.e., a breach of lease claim, or guaranty claims related to the same, where the leased premises are not a part of the bankruptcy estate) that is circumscribed by § 502(b)(6) of the Bankruptcy Code.
>
> If "termination" for purposes of § 502(b)(6) of the Bankruptcy Code equated to state law termination of the lease only, landlords could always avoid the damages cap in § 502(b)(6) by simply not "terminating" the lease if and when a lease is rejected, and instead cause accelerated rent claims to swallow the assets available for distribution to creditors in any given bankruptcy. Congress surely did not intend the statute to work this way. Accordingly, an exception to the plain meaning rule applies here because the "literal application of [the] statute will produce a result demonstrably at odds with the intention of its drafters." *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 242 (1989). In this rare type of case, the intention of the drafters, rather than the strict language, will control. *In re Mr. Gatti's, Inc.*, 162 B.R. 1004, 1010 (Bankr. W.D. Tex. 1994).

*In re Flanigan*, 374 B.R. at 577; *see also Broadfoot v. Jamestown Mgmt. Corp. (In re Int'l BioChemical Indus., Inc.)*, 521 B.R. 395, 402–03 (Bankr. N.D. Ga. 2014) (in determining that issuance of a writ of possession constituted "effective termination" stating, "[t]he definition of 'termination' crafted by the *Flanigan* court provides for implementation of § 502(b)(6) in the way it was intended—to limit large claims for rents and related damages that arise after the

8

beneficial interest in the premises has shifted in its entirety from the lessee to the landlord—while also serving the fundamental bankruptcy purpose of equality of distribution"); *cf. Lincoln Triangle Commercial Holding Co. LLC v. Halperin (In re Cortlandt Liquidating LLC)*, 658 B.R. 244, 253 n.5 (S.D.N.Y. 2024) (noting it "cannot credibly be argued that Section 502(b)(6) is limited in its application only to leases that terminate pursuant to state law"); *In re 6525 Belcrest Rd., LLC*, No. 21-10968 (MEW), 2023 WL 8519946, at *20 (Bankr. S.D.N.Y. Dec. 7, 2023) (stating in the context of postpetition rejection of a lease, "it is well-established that section 502(b)(6) applies as a cap on rejection damages without regard to whether a lease has terminated for state law purposes, and both parties agree that section 502(b)(6) acts as a cap on the [l]andlord's allowable rejection damages claim").

While termination in accordance with state law is one way to demonstrate "termination" of a lease as contemplated by § 502(b)(6), I am persuaded by the reasoning of *In re Flanigan* and similar cases that § 502(b)(6) contemplates a broader interpretation. Often, as is the case with the Lease, a commercial lease provides for very limited circumstances when a tenant may terminate the lease. As was the case here, many commercial leases will allow a landlord to assert a claim for accruing monthly rent, declare a default, and elect not to exercise a right to terminate. Notwithstanding those state law rights and remedies, it seems clear that Congress intended the § 502(b)(6) cap to apply to leases that have been rejected in bankruptcy, constituting a breach but not termination as of the petition date, and also to limit large landlord claims that could prejudice other creditors of a bankruptcy estate when a tenant effectively terminated the lease by its actions prepetition. *See* S. Rep. 95-989, at 63 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 5787, 5849. I interpret § 502(b)(6) to permit a finding that a lease was terminated for purposes of that section even where state law would not recognize a "termination."

9

Reasonable minds have differed on this interpretation, and, as cited above, courts have reached different results, but I conclude that a broader interpretation is the better reading of the statute.

The next step in deciding the Claim Objection and applicability of § 502(b)(6) is to determine at what point the actions of the Landlord or Lessees constituted an effective termination of the Lease. The Debtor contends that the Lease should be deemed to have terminated on September 22, 2020:

> [T]he restaurant ceased conducting business on March 15, 2020 when it was forced to shut down due to the Covid-19 pandemic and the mandatory governmental restrictions on restaurants that followed. The Landlord served a Notice of Default upon the Lessees on April 13, 2020, and, days later, on April 17, 2020, the Lessees invoked the force majeure clause under the Lease. Undeterred, the Landlord refused to recognize the force majeure clause under the lease, demanded the rental payments during the period of the governmental shutdown of restaurants, and refused to enter into any meaningful discussions with the Lessees through August 2020. At this point, the restaurant remained closed with no hope of ever reopening, and the discussions with the Landlord that were finally able to be take place in September 2020 involved terminating matters with formality, and selling the liquor license in an attempt to mitigate damages. The Landlord refused any settlement overtures that had been made by the Lessees, and on September 22, 2020, the Landlord confirmed its possession and control over the Premises by setting forth its conditions under which the Landlord would "allow" the Lessees to reopen . . . – despite having been informed by the Lessees that reopening the restaurant was not feasible.

Debtor's Br., at 8–9.

On this record, I am unable to find that the Lease was effectively terminated at any time prior to the date of termination by the Landlord's notice as of January 17, 2022. In correspondence to the Landlord dated September 22, 2020, counsel to Mabrothers, LLC states that the Debtor "justifiably believes that . . . it would not be possible to reopen the restaurant under current conditions." ECF No. 63-5. In that letter, counsel proposes certain terms regarding termination of the Lease, including the sale of the restaurant's liquor license and a division of proceeds. The proposal regarding termination was made with a full reservation of rights. At that time, those rights presumably included the right to assert that the force majeure

10

clause excused or delayed the Lessees' obligation to pay rent and the right to possess the Premises pursuant to the Lease.

When the Landlord sued for damages (not possession) in October of 2020, the Lessees asserted affirmative defenses and counterclaims.  It does not appear that the Lessees asserted in any pleading that they had surrendered the Premises or that they considered the Lease to have been terminated at that time.  Later, in connection with an opposition to the Landlord's motion for summary judgment in a Superior Court action, the Debtor stated that "Plaintiffs terminated the Lease effective January 17, 2022."  ECF No. 63-6, at 61.  Certainly, the Landlord could have sought a judgment for possession in 2020 or after, but strategically chose not to do that.

Section 502(b)(6) uses "termination" in describing the damages that are subject to the cap and "surrender" in providing how the cap is to be calculated.  Termination is not surrender, but surrender by a tenant could mean termination for purposes of § 502(b)(6).  There is no evidence in the record from which I could conclude that the Lessees attempted to "deliver the keys" and offered to voluntarily surrender possession, but there are references in briefs to the fact that the Debtor may have attempted to "deliver the keys," but that the Landlord never consented to a surrender.  Landlord's Br., at ¶¶ 25, 37; *but see* ECF No. 68, at ¶ 24.  Moreover, it appears that the Lessees at various times took the position that there was no default on the Lessees' behalf under the Lease because of the force majeure provision or the doctrine of frustration of purpose, while attempting to settle and use the liquor license—potentially for a new tenant—as a means to settle.  Thus, on this record, I cannot determine whether or when the Debtor effectively terminated the Lease by surrendering possession in September of 2020 or at any time prior to the date of termination by the Landlord's notice as of January 17, 2022.[9]

---

[9] *See, e.g.*, *In re Mallett, Inc.*, No. 21-11619 (JLG), 2023 WL 8885916, at *9–10 (Bankr. S.D.N.Y. Dec. 22, 2023) (finding termination and surrender on the date "Debtor attempted to return the keys to the Landlord" and after "the

11

In the record is a "Notice of Termination" dated January 7, 2022, addressed to the Lessees from Landlord's counsel. ECF No. 63-7. The Notice of Termination puts Lessees on notice of "Landlord's intention to terminate this Lease with an effective termination date of January 17, 2022," that the Landlord may initiate an action to evict the Lessees, and a reservation of rights under the Lease. The Notice of Termination also references Section 22 of the Lease, which provides terms with respect to the Landlord's authority to terminate the Lease.[10]

The Landlord contends that the Notice of Termination does not constitute termination under Massachusetts state law, and instead the Lease terminated by its own terms in January of 2023. Landlord's Br., at ¶¶ 2, 21, 23. Whether or not the Notice of Termination constituted a termination under Massachusetts law, I have adopted a broader definition of "termination" and hold that the Notice of Termination effectively terminated the Lease pursuant to § 502(b)(6) on January 17, 2022. *See In re 6525 Belcrest Rd., LLC*, 2023 WL 8519946, at *22. I need not dissect the statement of intent in that notice, which, when not withdrawn prior to the intended

---

Debtor had not occupied the space for years, the Subtenant had vacated the space, and the Debtor intended to terminate the Lease").

[10] Section 22 of the Lease states, in relevant part:

22. Events of Default
. . .

    22.2. If an event of default shall have occurred, Lessor shall have the right, at its election, then or at any time thereafter to pursue any one or more of the following remedies, in addition to all other rights or remedies provided herein or at law or in equity:

        22.2.1. Lessor may terminate this Lease and forthwith repossess the Premises and be entitled to recover as damages . . . .

        22.2.2. Lessor may terminate Lessee's right of possession (but not the Lease) and may repossess the Premises by forcible entry or detainer suit or otherwise, without demand of notice of any kind to Lessee and without terminating this Lease, in which event Lessor may, but shall be under no obligation to do so, relet the same for the account of Lessee for such rent and upon such terms as shall be satisfactory to Lessor. . . .

ECF Nos. 63-2; 65-2.

termination date, may have been found to constitute a notice of termination of the Lease under Massachusetts law.

Having decided that the Lease terminated prepetition and that a portion of the damages claimed by the Landlord were a result of termination, I must also determine when the Lessees surrendered possession of the Premises to calculate any applicable cap under § 502(b)(6)(A)(ii). The Landlord argues that a majority of other courts that have construed the term "surrender" in § 502(b)(6) have looked to state law. *See, e.g.*, *1500 Mineral Spring Assocs., LP v. Gencarelli*, 353 B.R. 771, 786 (D.R.I. 2006) ("Since the statute does not define when surrender or repossession of leased property occurs, that determination is made pursuant to state law unless state law conflicts with the Bankruptcy Code."); *Smith v. Sprayberry Square Holdings, Inc. (In re Smith)*, 249 B.R. 328, 335 (Bankr. S.D. Ga. 2000) (holding that "[s]tate law determines whether real estate was surrendered to a lessor for the purposes of § 502(b)(6)"); *Fifth Ave. Jewelers, Inc. v. Great East Mall, Inc. (In re Fifth Ave. Jewelers, Inc.)*, 203 B.R. 372, 378 (Bankr. W.D. Pa. 1996) ("This Court, after considerable research and thought, concludes that, because § 502(b)(6) deals with 'damages resulting from the termination of a lease of real property,' the use therein of the terms 'repossessed' and 'surrendered' must necessarily refer to the events that effect a termination of a real property lease under state law"); *In re Iron-Oak Supply Corp.*, 169 B.R. 414, 418 (Bankr. E.D. Cal. 1994) ("conclud[ing] that whether a leasehold was 'surrendered' for purposes of section 502(b)(6) before bankruptcy is governed by state law"). The Landlord argues that this Court should not apply "some vague federal standard" to determine the meaning of "termination" and "surrender" as used in § 502(b)(6). Landlord's Br., at 13. While state law may inform a determination of when leased property has been surrendered for purposes of calculating capped damages under § 502(b)(6)(A)(ii), it does not

13

control that determination or limit me from looking to the facts and circumstances of this case to determine whether the Premises were surrendered in applying that provision of the Bankruptcy Code. *See In re Mallett, Inc.*, 2023 WL 8885916, at *11 ("whether a 'lessee surrendered . . . the leased property,' under section 502 is gauged by the actions of the debtor lessee[,]" not state law); *In re Int'l BioChemical Indus., Inc.*, 521 B.R. at 404 (preferring a "federal definition of 'surrender'" over state law definition); *In re MDC Sys., Inc.*, 488 B.R. 74, 85 (Bankr. E.D. Pa. 2013) (favoring "ordinary, dictionary-like definition" of surrender over state law).

As I have stated, nothing in the record as it exists demonstrates undisputed, clear action by the Lessees to "deliver the keys," offer a judgment for possession, or otherwise formally surrender possession of the Premises. The bankruptcy case filed by Mabrothers, LLC might inform a surrender date. Mabrothers, LLC filed its chapter 7 petition on February 27, 2022. It operated the restaurant at the Premises and presumably owned any personal property at the restaurant.[11] In that case, on March 11, 2022, the chapter 7 trustee filed a Notice of Abandonment with respect to all personal property of Mabrothers, LLC and clearly stated his position that the Landlord terminated the lease prepetition and claimed no right of possession. Case No. 22-10229, ECF No. 13. The notice was served on counsel for the Landlord, no objections were filed, and the abandonment became effective fifteen days later, on March 26, 2022. *See* 11 U.S.C. § 554; Fed. R. Bankr. P. 6007(a)(2).

While, notwithstanding the acts and statements of the Mabrothers, LLC chapter 7 trustee, under Massachusetts law, the Debtor (as co-lessee) would likely have been considered to have a right of possession in the Premises absent a formal surrender, nothing in the record indicates that the Debtor resisted repossession by the Landlord after the Landlord terminated the Lease. The

---

[11] The Mabrothers, LLC schedules included $15,000 in restaurant equipment. Case No. 22-10229, ECF No. 14. The Debtor in this case did not include this equipment in his schedules.

14

Mabrothers, LLC chapter 7 trustee's position was clear that estate asserted no rights to the Premises or the personal property therein. At this point, the Landlord could have requested or demanded that it re-take possession and begin the process of re-leasing the Premises. The Landlord chose not to request to repossess the Premises, but rather chose to preserve a legal position that the Lease had not terminated under state law and the Premises had not been surrendered. Under certain circumstances, a landlord's ability to repossess by itself, however, does not determine the date upon which the statutory cap applies. *See* 11 U.S.C. § 502(b)(6)(A)(ii) ("the date on which such lessor repossessed, or the lessee surrendered, the leased property"); *In re Int'l BioChemical Indus., Inc.*, 521 B.R. at 404 (because debtor had not vacated completely by leaving behind equipment, the court found § 502(b)(6) cap applied on the date of repossession); *see also In re Mallett, Inc.*, 2023 WL 8885916, at *11 (fixing the cap on the date "the Debtor attempted to return the keys"); *In re MDC Sys., Inc.*, 488 B.R. at 87 (cap applied on date when tenant vacated and landlord took possession).

      While I have found no law addressing a circumstance where a co-lessee's surrender was viewed to effect a surrender for all lessees for the purposes of applying § 502(b)(6), if viewed with evidence that may be developed regarding attempts to surrender possession, the facts and circumstances could support a determination that the Lessees surrendered the Premises at the time that the Mabrothers, LLC bankruptcy estate abandoned its personal property. Evidence is necessary to make that determination. The record only contains unverified allusions to offering the keys or expressions of surrender.

## IV.   Force Majeure and Frustration of Purpose

      I must now consider the effects of the Lease's force majeure provision and Debtor's arguments with respect to frustration of purpose and the Covid-19 pandemic. The Debtor asserts

15

that the force majeure provision of the Lease excused the Lessees from any obligation to pay rent during the time when governmental orders limiting operations during the pandemic were in effect. That provision states:

> 37. Force Majeure. Whenever a period of time is herein prescribed for the taking of any action by Lessor or Lessee, Lessor or Lessee as the case may be shall not be liable or responsible for, and there shall be excluded from the computation of such period of time, any delays due to strikes, riots, acts of God, shortages of labor or materials, war, government laws, regulations or restrictions, or any act, omission, delay or neglect of Lessee or Lessor or any of Lessee's or Lessor's employees or agents, or any other cause whatsoever beyond the control of Lessor or Lessee.

ECF Nos. 63-2; 65-2.

The Landlord argues that the force majeure provision was not implicated because the restaurant could have remained open and could have provided catering or take out. The Landlord concedes that the law is sparse in the First Circuit regarding application of force majeure clauses to facts presented by the Covid-19 pandemic and notes that courts across the country have taken different approaches, often focusing on the specific language of the applicable lease. *See* ECF No. 79, at 9–11; *BP Prucenter Acquisition LLC v. Saks Fifth Ave. LLC*, No. 20MISC000353JSDR, 2023 WL 2567961, at *2 (Mass. Land Ct. Mar. 20, 2023) ("*Saks Fifth Ave. II*") (compiling and surveying the language of force majeure provisions cited in cases). As carefully surveyed in a decision issued by the Massachusetts Land Court,

> the parties' obligations are defined by the express language of the *force majeure* clause negotiated by them. Some clauses provide that the obligation subject to the *force majeure* clause is delayed, not excused. *See, e.g.*, *Washington Crown Ctr. Realty Holding LLC v. Hollywood Theaters, Inc.*, Civ. A. No. 20-1997, 2022 WL 623388 at *2, 6 [] (W.D. Pa. Mar. 3, 2022) ("Delays in performance by either Landlord or Tenant of the obligations contemplated under this Lease due to [expressly designated events] shall be deemed events of force majeure ... and such delays shall be excused"); *La Simple Co. v. SLP Enters., LLC*, Civil No. 21-10058-LTS, 2021 WL 1648762 at *2 [] (D. Mass. Apr. 27, 2021) ("During any such case of Force Majeure, the Agreement shall not be terminated, but only suspended, and the party affected shall continue to perform its obligations to the extent possible and resume the performance of its suspended obligations as soon

16

>   as such case of Force Majeure is removed or alleviated."); *Simon Prop. Grp., LP v. Regal Entm't Grp.*, C.A. No. N21C-01-204 MMJ (CCLD), 2022 WL 2304048, at *2 (Del. Super. Ct. June 27, 2022) ("The period of time during which either party is prevented or delayed in any performance ... shall be added to such party's time for performance"); *A/R Retail LLC v. Hugo Boss Retail, Inc.*, 149 N.Y.S.3d 808, 816, 72 Misc.3d 627 (Sup. Ct. 2021) ("Dates by which performance obligations are scheduled to be met will be extended for a period of time equal to the time lost due to any delay so caused."). The clause in *In re Cinemex USA Real Estate Holdings, Inc.*, 627 B.R. 693, 700 (Bankr. S.D. Fla. 2021) . . . states ("[if] the performance by Landlord or Tenant of any of its obligations under this Lease is delayed by reasons of 'Force Majeure', the period for commencement or completion thereof shall be extended for a period equal to such delay."). The clause in *In re Hitz Rest. Grp.*, 616 B.R. 374, 376-77 (Bankr. N.D. Ill. 2020) . . . states that "Landlord and Tenant shall each by excused from performing its obligations ... but only so long as the performance of any of its obligations are prevented or delayed, retarded or hindered." In contrast, the *force majeure* clause in the Lease states that "neither party shall in any event be liable for failure to perform any obligation under this Lease in the event such party is prevented from so performing." . . . . The court reads that language as doing what it says: relieving Saks of its obligation to pay rent, not delaying or extending it, during a *force majeure* event.

*Id.*

I disagree with the Landlord's position that the force majeure provision was not implicated for some period when operations of the restaurant were significantly limited by government orders and the effects of the pandemic. Government restrictions and the unique circumstances of the pandemic certainly were beyond the control of the Lessees. The fact that the Landlord asserts that the Debtor could have provided take out service does not mean that the Lessees and restaurant operations would not have operated at a continuing loss during that period. There is no real record from which to make that assessment other than the statements of the Debtor.

On the other hand, the language of the force majeure clause in the Lease is not as clear as in leases in other reported decisions so the consequence of the force majeure must be interpreted. The question is whether the Lessees are excused from paying rent during the force majeure event

17

or whether performance of that term is simply delayed. The force majeure clause begins with the following language:

> Whenever a period of time is herein prescribed for the taking of any action by Lessor or Lessee, Lessor or Lessee as the case may be shall not be liable or responsible for, and there shall be excluded from the computation of such period of time, any delays due to [certain conditions.]

ECF Nos. 65-2; 65-2. The Debtor focuses on the words "shall not be liable or responsible for" to support his argument that performance is excused, but I cannot ignore the word "delays" that follows the clause "and there shall be excluded from the computation of such period of time." The most natural reading of the force majeure provision is that the Lessees will not be liable for "delays" in the payment of rent caused by a force majeure event, not that payment of rent is excused. I do not read that phrase broadly enough to excuse performance in the context of the entire provision.

A force majeure clause is an allocation of risk between contracting parties for consequences of events beyond the parties' control. The party asserting the application of the clause has the burden of proof. As summarized by one court:

> A *force majeure* clause has been defined as a "contractual clause that excuses performance of contractual obligations—either wholly or for the duration of the force majeure—upon the occurrence of a covered event which is beyond the control of either party to the contract." *In re CEC Entm't Inc.*, 625 B.R. 344, 353 (Bankr. S.D. Tex. 2020), quoting *In re Flying Cow Ranch HC, LLC,* 2018 WL 7500475, at *2 [] (Bankr. S.D. Fla. June 22, 2018). *See also MD Helicopters Inc. v. Boeing Co.*, 2019 WL 3840974, at *5 [] (D. Ariz. Aug. 15, 2019) ("A *force majeure* clause is '[a] contractual provision allocating the risk of loss if performance becomes impossible or impracticable, especially as a result of an event or effect that the parties could not have anticipated or controlled.' *Force-Majeure Clause, Black's Law Dictionary* (11th ed. 2019)"); Timothy Murray, *Corbin on Contracts: Force Majeure And Impossibility of Performance Resulting From COVID-19,* § 1.02 (2021) [] ("In the parlance of contract law, '*force majeure*' (superior or irresistible force) generally means that a party to a contract is excused of its obligations because some unforeseen event beyond that party's control has prevented performance of those obligations or made performance

18

excessively burdensome."). "A claim of '*force majeure*' is equivalent to an affirmative defense." 30 Samuel Williston et al., *A Treatise On The Law Of Contracts*, § 77:31 at 358 (4th ed. 2021) []. The burden of proof is on the party asserting the claim. *See Lenn v. Riche*, 331 Mass. 104, 111 [] (1954) ("This defence [sic] [of *force majeure*] is akin to the defence [sic] of impossibility of performance under our law, where the burden of proof is on the defendant."); *La Simple Co. v. SLP Enters LLC*, 2021 WL 1648762, at *6 [] (D. Mass. Apr. 27, 2021) (stating that under Massachusetts law, "even if the Force Majeure clause is logically implicated here, the burden remains with [the party invoking the clause] to establish a likelihood that it will succeed in proving all of the terms of the clause are satisfied.").

*BP Prucenter Acquisition LLC v. Saks Fifth Ave. LLC*, No. 20MISC000353JSDR, 2022 WL 17976023 (Mass. Land Ct. Dec. 15, 2022) ("*Saks Fifth Ave. I*"), *on reconsideration in part*, *Saks Fifth Ave. II*, 2023 WL 2567961.

Because I have held that the force majeure clause in the Lease only delays, but does not excuse, performance, there does not appear to be evidentiary issue presented by the specific period that that provision would apply and when the deferred rent would have become due, but it could be relevant to determination of the Debtor's objection to late fees.

The Debtor also asserts that, even if the force majeure provision did not excuse the Lessees' payment of certain rent, the doctrines of "impossibility" and "frustration of purpose" did. At least one Massachusetts Superior Court judge has held that, where a tenant during the Covid-19 shutdown was not able to use leased property in the manner the parties had intended, the frustration of purpose doctrine may apply to excuse the tenants from paying rent and other sums due under the lease. *UMNV 205-207 Newbury, LLC v. Caffé Nero Americas, Inc.*, No. 2084CV01493-BLS2, 2021 WL 956069, at *1 (Mass. Super. Feb. 8, 2021). Other Massachusetts courts have held that the defenses of impossibility and frustration of purpose are unavailable when the parties have specifically considered the effects of force majeure events in a force majeure clause. *See Saks Fifth Ave. I*, 2022 WL 17976023, at *14 and n.12 (surveying cases);

19

see also *Inland Com. Real Est. Servs., LLC v. ASA EWC, LLC*, 102 Mass. App. Ct. 796, 798–800 and n.2 (2023), *review denied*, 493 Mass. 1102 (2023) (declining to follow *Caffé Nero Americas, Inc.*).  While this may lead to a harsh result for the Debtor, where the Lease has clearly assigned risks arising from force majeure, the affirmative defenses of impossibility and frustration of purpose may not be applied to excuse the Debtor's obligation to pay rent.

V. **Conclusion**

On the present record, I have determined that the Lease terminated at least by January 17, 2022.  Pending a further determination on whether and when the Debtor surrendered the Premises, the Court may cap damages arising from the termination of the Lease pursuant to § 502(b)(6).  This ruling does not decide the Debtor's Claim Objection on the issues reserved or with respect to CAM charges, late fees (which should accrue only after the end of the force majeure period), real estate recovery, and real estate taxes.  I will schedule a case management conference to discuss the scheduling an evidentiary hearing.  On or before October 30, 2025, the Debtor shall file affidavit(s) and copies of documents that could support a determination when the Premises were surrendered.  If the Debtor is unable to proffer sufficient evidence of surrender, which could support a factual finding that the Premises was surrendered at a time relevant to a determination of application of the § 502(b)(6) cap (and demonstrate issues of material fact to be determined at an evidentiary hearing), I will decide the issue without the need to conduct an evidentiary hearing.

Dated: September 30, 2025                    By the Court,

                                              _____
                                              Christopher J. Panos
                                              United States Bankruptcy Judge